## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **HEATHER ENGLISH, JOE HAWLEY** and **ROBIN BROUSSARD,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § § | **CASE NO. 6:17-cv-00323-ADA-JCM** |
| **TEXAS FARM BUREAU CASUALTY INSURANCE COMPANY, TEXAS FARM BUREAU MUTUAL INSURANCE COMPANY, TEXAS FARM BUREAU UNDERWRITERS, FARM BUREAU COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, and SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY,** | § § § § § § § § § § § | |
| **Defendants.** | § § | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST RICHARD AYALA, DANNY CATHEY, TERRY GARDINER, JOSHUA HARRIS, ERIN HARTGROVE, JOE HAWLEY, TANYA NORIEGA, DAVID PEREZ, DEBRA SICKELS, JENNIFER THOMASON, AND AUSTIN VASS

Texas Farm Bureau Casualty Insurance Company, Texas Farm Bureau Mutual Insurance Company, Texas Farm Bureau Underwriters, Farm Bureau County Mutual Insurance Company of Texas, and Southern Farm Bureau Life Insurance Company (Defendants) file this motion for summary judgment, asking that a take-nothing judgment be rendered against Richard Ayala, Danny Cathey, Terry Gardiner, Joshua Harris, Erin Hartgrove, Tanya Noriega, David Perez, Debra Sickels, Jennifer Thomason, and Austin Vass (Plaintiffs).[1]  Each of these Plaintiffs falls under the outside sales exemption under the Fair Labor Standards Act ("FLSA") and is not entitled to overtime compensation.  Accordingly, Defendants ask that the Court issue a take take-nothing judgment against each of these Plaintiffs and dismiss their claims with prejudice.[2]

## I.   Introduction.

Plaintiffs seek overtime compensation from Defendants, claiming that they were misclassified as independent contractors when they were actually employees.  Defendants firmly deny that allegation; Plaintiffs were properly classified.  As will become evident from the facts set forth below, Plaintiffs had a great deal of freedom in and control over their professional lives and daily work.  Defendants reserve the right to continue to assert that Plaintiffs were properly classified if their claims are not resolved on summary judgment.

For purposes of this motion, however, Plaintiffs' classification is of no matter.  Even assuming arguendo that Plaintiffs should have been classified as employees, they still have no

---

[1] Defendants seek individual relief against each of these Plaintiffs based on the specific facts of each Plaintiff's situation—which the Court will see are varied—but seek this relief in a single document for the purpose of efficiency and to ease the burden on the Court.
Also, Plaintiffs incorrectly allege that Defendants form a "single enterprise" and are "joint employers."  ECF 39 at 5-8.  For purposes of this motion only, Defendants do not challenge these allegations but reserve the right to do so if summary judgment is not granted.
[2] In support of this motion, Defendants rely on the evidence in the attached Appendix, certain evidence submitted by Plaintiffs in support of their Motion for Conditional Certification, and the pleadings filed herein.

damages because they fall within the FLSA's outside-sales exemption and are not entitled to overtime.

There are sound principles behind this exemption, as explained by the United States Supreme Court a few years ago:

> Our holding [that the plaintiffs qualify for the outside sales exemption] comports with the apparent purpose of the FLSA's exemption for outside salesmen. The exemption is premised on the belief that exempt employees "typically earned salaries well above the minimum wage" and enjoyed other benefits that "se[t] them apart from the nonexempt workers entitled to overtime pay." It was also thought that exempt employees performed a kind of work that "was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium." Petitioners—each of whom earned an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs in his assigned sales territory—are hardly the kind of employees that the FLSA was intended to protect. And it would be challenging, to say the least, for pharmaceutical companies to compensate detailers for overtime going forward without significantly changing the nature of that position.

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 166, 132 S. Ct. 2156, 2173 (2012) (citing Department of Labor (DOL), Wage and Hour Division, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, preamble to 2004 regulations (hereinafter DOL Preamble), 69 Fed. Reg. 22124 (Apr. 23, 2004) (internal citations omitted).

The outside-sales inquiry is highly individualized, which is why each Plaintiff's facts are explored separately in detail below.  DOL Wage Hour Op. Ltr. No. FLSA2009-28, 2009 DOLWH LEXIS 32, *10 (Jan. 16, 2009) ("each agent must be evaluated on an individual basis to determine whether he or she qualifies for the outside sales exemption"); *see also e.g.*, *Gold v. New York Life Ins. Co.*, No. 09 Civ. 3210, 2011 U.S. Dist. LEXIS 62095, *12 (S.D.N.Y. May 19, 2011) (concluding that the question of entitlement to overtime pay in light of an outside-sales

defense is answered by examining the employee's actual duties, not the generic duties of similar employees).

As set forth below, each of the Plaintiffs against whom Defendants seek summary judgment on the basis of the outside-sales exemption spent significant time away from the office selling insurance and performing tasks critical to the sales process.  Although they did so in different ways, they all relied on out-of-the-office activities on a regular basis to sell insurance.  They had the ability to set their own schedules and determine whom to solicit, how, and when.  Many Plaintiffs wrote off sales-related expenses on their taxes.  They were compensated on a commission basis and earned tens of thousands of dollars—and in many cases hundreds of thousands of dollars—a year.  Like the plaintiffs in *Christopher*, they are "hardly the kind of employees that the FLSA was intended to protect."

## II.     Relevant legal standards.

As emphasized elsewhere, Defendants deny that they misclassified Plaintiffs as independent contractors, and Defendants will vigorously pursue that defense if this matter is not resolved on this motion for summary judgment.  But Rule 56 allows a party to move for summary judgment on any defense, including one (like the outside-sales exemption here) that is pled alternatively.  *See* Fed. R. Civ. P. 56(a); 2010 advisory committee notes ¶23; *Romano v. SCI Direct, Inc.*, No. 2:17-cv-03537-ODW, 2018 U.S. Dist. LEXIS 47723, *14 (C.D. Cal. March 21, 2018) (specifically rejecting plaintiffs' argument that defendant could not move on outside-sales and continue to assert that plaintiffs were appropriately classified as independent contractors, and granting summary judgment in favor of defendants on exemption); *Taylor v. Waddell & Reed, Inc.*, No. 09cv2909 AJB (WVG), 2012 U.S. Dist. LEXIS 212, at *8-9 n.2, *16 (S.D. Cal. Jan. 3, 2012) (same).

The Court must grant summary judgment if Defendants show that (i) there is no genuine dispute as to any material fact and (ii) they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party may move for summary judgment "*at any time* until 30 days after the close of all discovery."  *Id.* at 56(b) (emphasis added).  It is not necessary that discovery have been completed—or even begun—for summary judgment to be appropriate.  *See id.*; *see also B.A. v. Miss. High Sch. Activities Ass'n*, 983 F. Supp. 2d 857, 861 (N.D. Miss. 2013) (rejecting plaintiffs' argument that summary judgment motion was premature when no discovery had been conducted because of plain language of Rule 56 and additionally because plaintiffs had not explained what discovery would be necessary to challenge the reason for summary judgment).[3]

Summary judgment is appropriate even though the Court has not decided whether to conditionally certify the class.  *See, e.g.*, *Hollins v. Regency Corp.*, 867 F.3d 830, 834 (7th Cir. 2017) (determining that FLSA summary judgment granted in favor of defendant against sole named plaintiff was final despite pending motion for conditional certification); *Crawford v. Saks & Co.*, Civ. No. H-14-3665. 2016 U.S. Dist. LEXIS 71805, *2 (S.D. Tex. June 2, 2016) (granting FLSA summary judgment against the 3 named plaintiffs, denying the motion for conditional certification as moot, and dismissing the case); *Taylor*, 2012 U.S. Dist. LEXIS 212, *16-17 (granting summary judgment in favor of defendant on outside-sales exemption and therefore denying motion for conditional certification as moot); *Bernal v. Trueblue, Inc.*, 730 F. Supp. 2d 736, 738 (W.D. Mich. 2010) ("in the interest of conserving resources, a court may

---

[3] The fact that Defendants move for summary judgment against some, but not all, of the Plaintiffs should not be considered as a statement on the merits of the remaining Plaintiffs' claims or Defendants' defenses thereto.  Defendants reserve their right to file another motion, against these or other plaintiffs, at a later date.

consider a motion for summary judgment prior to considering a motion for collective action certification").[4]

The outside-sales exemption is an affirmative defense that Defendants must prove by a preponderance of the evidence. *Meza v. Intelligent Mexican Mktg.*, 720 F.3d 577, 580-81 (5th Cir. 2013). "[C]ourts are to give FLSA exemptions 'a fair reading,' as opposed to the narrow interpretation previously espoused by [the Fifth] and other circuits." *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142, 200 L. Ed. 2d 433 (2018)). The question of how an employee spends his time working is one of fact, but the question of whether those activities exempt him from the FLSA is one of law. *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 440 (S.D.N.Y. 2017).

## III.    The outside-sales exemption.

Under the FLSA, an employer may not employ an employee "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). But "outside salesm[e]n," along with several other types of employees, are exempt from the FLSA's overtime requirements. 29 U.S.C. § 213(a)(1); *see also Meza v. Intelligent Mexican Mktg.*, 720 F.3d 577, 581 (5th Cir. 2013). An employee qualifies for the outside-sales exemption if (i) his "primary duty" is "making sales" and (ii) the employee is

---

[4] *See also Cooper v. Terminix Int'l Co.*, No. 4:17-CV-3671, 2018 U.S. Dist. LEXIS 72451, *14-15 (S.D. Tex. April 11, 2018) (dismissing named plaintiff's claims before granting conditional certification and dismissing opt-in plaintiffs because absent conditional certification and notice, the individuals "who filed consent-to-join forms are not yet parties to this case"). Defendants seek relief with respect to the opt-ins addressed herein out of an abundance of caution and not as a concession that they are yet parties. Defendants' referral to all of the individuals against whom summary judgment is sought as "Plaintiffs" is for ease of reference and also not also a concession that they are parties.

"customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a).[5]

A.     **There are good reasons for the outside-sales exemption.**

The "white collar exemptions," which include the outside-sales exemption, are sensible and backed by sound policy.  They are "premised on the belief that the workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges  . . . , setting them apart from the nonexempt workers entitled to overtime pay."  DOL Preamble, 69 Fed. Reg. 22123-24.  Specifically regarding the outside-sales exemption, the Fifth Circuit (quoting and citing a Tenth Circuit opinion released shortly after the FLSA was enacted in 1938) has similarly explained that:

> The logic of the exemption is that 'such a salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.' An outside salesman's extra compensation comes in the form of commissions, not overtime, and because most of the salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an outside salesman works.

*Meza*, 720 F.3d at 581 (quoting and citing *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941)).  The idea that an employer "often has no way of knowing how many hours an outside salesman works," *id.*, was echoed by the Supreme Court in *Christopher* when it wrote that outside-sales work is hard "to standardize to any time frame," makes "compliance with the overtime provisions difficult," and makes it "challenging, to say the least," for employers to compensate "for overtime going forward without significantly changing the nature of that position."  567 U.S. at 166.

---

[5] Congress did not define "outside salesman" but delegated authority to the DOL to do so.  29 U.S.C. § 213(a)(1).

Validly promulgated DOL regulations, like the ones at issue here, are entitled to significant deference under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984).  *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 168 (2012).

B.      **Plaintiffs admit their primary duty was sales.**

Plaintiffs have admitted the first element of the outside sales exemption—that their primary duty was making sales.  Indeed, the First Amended Complaint alleges that Plaintiffs' "***primary job duties*** were the ***selling*** of Defendants' insurance services and products."  ECF 39 at ¶54 (emphasis added); *see also McCreary v. Richardson*, 738 F.3d 651, 659 n.5 (5th Cir. 2013) ("This circuit has long noted that factual statements in the pleadings constitute binding judicial admissions . . . .").

C.      **Plaintiffs customarily and regularly engaged in sales activities away from Defendants' places of business.**

Because Plaintiffs admit their primary duty was sales, the dispositive question before the Court is whether these eleven Plaintiffs customarily and regularly engaged in sales away from Defendants' offices.  To answer that question, the Court must understand both how "sales" is defined, and what constitutes "customary and regular" engagement in outside sales.  Defendants address each concept in turn before turning to the individual facts for each Plaintiff necessary to satisfy the fact-specific inquiry required.

1.      **"Sales" includes promotional work, customer service, and other work incidental to sales.**

The FLSA defines "sale" or "sell" as "includ[ing] any sale, exchange, contract to sell, . . . or other disposition."  29 U.S.C. § 203(k).  In determining whether a plaintiff is an outside salesperson, courts have also considered several other factors, including:

- whether the employee's compensation is based wholly or significantly on commission or incentive compensation,

- whether the employee independently solicits new business,

- the extent to which the employee's work is unsuitable to an hourly wage, and

- whether a worker sought reimbursement from the employer—or took tax write-offs—for mileage, parking, or meal expenses.

*See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 165-66 (2012); *Hall v. Haworth, Inc.*, No. H-12-1776, 2014 U.S. Dist. LEXIS 192180, *16 (S.D. Tex. April 3, 2014); *Lane v. Humana Marketpoint, Inc.*, No. 1:09-CV-380, 2011 U.S. Dist. LEXIS 59608, *16-17 (D. Idaho June 3, 2011); *Lint v. Northwestern Mutual Life Ins. Co.*, No. 09CV1373, 2010 U.S. Dist. LEXIS 123117, *8-10 (S.D. Cal. Nov. 19, 2010); *Chenensky v. N.Y. Life Ins. Co.*, 07 Civ. 11504 (WHP), 2009 U.S. Dist. LEXIS 119549, at *13 (S.D.N.Y. Dec. 22, 2009).

   **a.   Sales includes promotional work, whether it is successful or not.**

   The concept of "sales" encompasses far more than the final consummation of a sale. "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work."   29 CF.R. § 541.503(a).   And "preliminary steps toward the end goal" of sales also fall within the definition of sales activities for purposes of the exemption.   *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 398 (9th Cir. 2011), *aff'd*, 567 U.S. 142 (2012); *accord Chenensky v. N.Y. Life Ins. Co.*, 07 Civ. 11504 (WHP), 2009 U.S. Dist. LEXIS 119549, at *14-15 (S.D.N.Y. Dec. 22, 2009) (finding outside-sales exemption applicable when insurance agent "solicited new business, presented available products to prospects, obtained a commitment to purchase, and ultimately received a commission-based salary").   Promotional work, solicitations, and other sales-related activities do not have to be "fruitful in producing sales," or even to have "a legitimate prospect of a sale at the end of the day, to be deemed 'incidental to' and 'in conjunction with' outside-sales work." *Palmieri v. Nynex Long Distance Co.*, No. 04-138-P-S, 2005 U.S. Dist. LEXIS 6057, *50 (D. Me. March 28, 2005).   Qualifying outside-sales activity also includes networking with people who have the ability to influence sales to others.   *Hall*, 2014 U.S. Dist. LEXIS 192180 at *12, 16-20, 25.

**b. Sales also includes customer-service tasks.**

Customer-service tasks for a salesperson's customers also qualify as exempt sales work. "Other work that furthers the employee's sales efforts also shall be regarded as exempt work, including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences." 29 CF.R. § 541.500(b). This is a sensible rule, given that a salesperson is unlikely to get repeat business from a customer he does not take care of. *See, e.g., Lane*, 2011 U.S. Dist. LEXIS 59608, at *24 (finding outside-sales exemption to be applicable after stating, among other things, that "Plaintiffs had a vested interest in making sure their customers were kept happy and received good customer service."); *Palmieri*, 2005 U.S. Dist. LEXIS 6057, at *51 ("The question of responsiveness to service issues could not be neatly divided from that of the prospect of repeat sales" because customers were unlikely to repeat their business without good care).

**2. The "customarily and regularly engaged" test requires only that a salesperson, on a greater than occasional basis, engaged in activities critical to the sales process outside of the office.**

**a. "Customarily and regularly" does not require a particular quantity of outside sales work.**

Federal regulations define "customarily and regularly" as "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701. In 2004, the DOL clarified that the phrase does not require that a task be performed more than once a week or even every week. DOL Preamble, 69 Fed. Reg. at 22187; *Hall*, 2014 U.S. Dist. LEXIS 192180, at *8.

In fact, the DOL, has found the outside-sales exemption to apply even where an employee was outside the employer's place of business only "***one or two hours a day, one or two times a week.***"  DOL Wage Hour Op. Ltr. No. FLSA2007-2, 2007 DOLWH LEXIS 2, *2 (Jan. 25, 2007) (emphasis added).  The outside-sales inquiry depends on the *nature* of the time spent outside the employer's business rather than the *amount* of time. *Id.*  Thus, although some salesmen perform "most" of their work away from the employer's place of business, *see, e.g.*, *Meza*, 720 F.3d at 581, it is not a requirement for the outside-sales exemption to apply.  *See* 29 C.F.R. § 541.700(b) (explicitly clarifying that even under the primary-duty inquiry, "nothing . . . requires that an employee spend more than 50% of his or her time performing exempt duties"); 2007 DOLWH LEXIS 2, at *2; *Hazelbaker v. Metro Prop. & Cas. Ins. Co.*, No. CV-13-08067, 2014 U.S. Dist. LEXIS 148308, *8 (D. Ariz. Oct. 16, 2014) ("An employee need not devote the majority of his time to outside sales in order to be 'customarily and regularly' engaged as an outside salesman.").

**b.  Outside sales can take place at any number of locations.**

The phrase "away from the employer's place of business" includes sales "at the customer's place of business or . . . the customer's home."  29 C.F.R. § 541.502.  But "qualifying business" can also "be conducted 'at the gym, restaurants, sporting events, community events, [and] car dealerships'; at 'seminars and trade shows'; at the theater; in coffee shops; at 'bridal shows, baby shows, and street fairs'; and generally anywhere 'away from a fixed site.'"  *Hall*, 2014 U.S. Dist. LEXIS 192180, at *11.

Courts consider whether an activity is outside sales work holistically, rather than breaking down precisely where certain activities related to sales occurred.  *See, e.g.*, *Hazelbaker*, 2014 U.S. Dist. LEXIS 148308 at *9 (expressly rejecting plaintiffs' argument that promotional work only constitutes outside sales activity if it leads to a sale conducted outside the office);

*Wong v. HSBC Mortg. Corp.*, 749 F. Supp. 2d 1009, 1013 (N.D. Cal. 2010) ("'Making sales,' however, is not an activity that necessarily occurs at one time and/or in one location, but, rather, may comprise a number of component activities."). The "threshold issue" is whether the Plaintiffs, "on a greater than occasional basis, engaged in activities 'critical to the sales process' while outside of a fixed site." *Wong*, 749 F. Supp. 2d at 1014.

### D.    Outside sales in the insurance industry.

Several courts, on facts similar to those set forth below, have found insurance agents to qualify for the outside-sales exemption:

- *Lane v. Humana Marketpoint, Inc.*, No. 1:09-CV-380, 2011 U.S. Dist. LEXIS 59608, *16-17 (D. Idaho June 3, 2011) (finding captive insurance agents to fall within the outside sales exemption when a large percentage of their compensation was from commission, they spent a significant portion of their time on sales, were licensed to sell insurance, and mostly worked on their own and had fairly flexible schedules about half the time);

- *Lint v. Northwestern Mutual Life Ins. Co.*, No. 09CV1373, 2010 U.S. Dist. LEXIS 123117, *8-10 (S.D. Cal. Nov. 19, 2010) (granting summary judgment on outside sales against insurance agent when agent's job was to sell insurance, he was paid through commissions, he represented himself as having his own business on tax returns, and spent approximately 10-20% of his time meeting with clients or prospective clients, he engaged in travel to generate business and consummate sales, and determined his own schedule);

- *Bouder v. Prudential Fin., Inc.*, No. 06-CV-4359, 2010 U.S. Dist. LEXIS 91541, *29 (D.N.J. Aug. 31, 2010) (finding agents to be outside salesmen when plaintiffs sold insurance, asserted in their initial complaint that their primary duty was sales, worked on commission, and were regularly engaged in sales outside of the office—despite plaintiffs' "attempt to cloak the sales practice under the guise of financial advice and service");

- *Chenensky v. N.Y. Life Ins. Co.*, No. 07-11504, 2009 U.S. Dist. LEXIS 119549, *12 (S.D.N.Y. Dec. 22, 2009) (granting summary judgment against agent on outside-sales exemption when agent's primary duty was to sell insurance, he solicited new business, presented available prospects, obtained a commitment to purchase, received a commission-based salary, "would not have received *any* wages from New York Life had he only advised clients or maintained good relationships with customers, and had significant discretion over the content and structure of his worklife).

The Department of Labor reached the same conclusion—that insurance agents qualified as outside salespeople—when, among other things, the agents' primary duty was sales; the agents customarily and regularly met with clients face-to-face outside of the office; the agents communicated with clients both in and out of the office; the agents spent time in the office performing a number of other tasks, including preparing forms, compiling databases, and participating in training; and the agents were paid primarily or entirely through commissions. DOL Wage Hour Op. Ltr. No. FLSA2009-28, 2009 DOLWH LEXIS 32, *3-5 (Jan. 16, 2009).

IV.    **Plaintiff-specific facts and arguments.**

As noted, the inquiry requires a fact-specific examination for each Plaintiff.  Those individual facts, when considered in light of the law set forth above, demonstrate that Defendants are entitled to summary judgment against each of these eleven Plaintiffs.[6]

1.    **Richard Ayala (Appendix – Exhibit D)**

Richard Ayala sold insurance for Defendants from January 2007 to August 2016 and operated out of the Deer Park office in Harris County. ECF 68-14, ¶2; *see also* Exhibit C, Declaration of Steve Hartgrove, ¶1.  Ayala opted into this lawsuit on November 22, 2017.  ECF 13.[7]

Ayala was a successful agent, sold a lot of insurance, and made a significant income. In 2015, he earned more than $300,000 in commissions.  Exhibit A-1, Declaration of Sloan Brown,

---

[6] Again, the fact that Defendants have not moved for judgment on the outside sales exemption should not be construed as a statement on the merits of the remaining Plaintiffs' claims or Defendants' defenses thereto.

[7] The statute of limitations for FLSA claims is two years from the date a plaintiff files suit or opts-in, and three years if a plaintiff proves willfulness.  For example, Ayala opted in on November 22, 2017, so his maximum 3-year window is Nov. 22, 2014 to Nov. 22, 2017.

¶10; Exhibit A-2, Declaration of Rena Warren, ¶7.  In 2016, even though he only sold insurance for Defendants for eight months, he still earned more than $200,000 in commissions.  *Id.*[8]

At the time Ayala was an agent, the Agency Manager in Harris County was Steve Hartgrove.  Ex. C, ¶1.  Harris County had three offices – Deer Park, Memorial and the main office, Stuebner Road.  *Id.*  According to Hartgrove, he never required Ayala to have any type of set schedule.  *Id.* at ¶5.  While agents have tremendous flexibility in setting their own schedule, there is an "Agent on Duty" program in the Harris County offices, where agents can sign-up to be "Agent on Duty" on a particular day from 8:00 a.m. to 12:30 p.m. or 12:30 p.m. to 5:00 p.m. Ex. C, ¶4.  The AOD program is strictly voluntary, however.  *Id.*

In addition, agents have the ability to hire Insurance Service Representatives ("ISRs") to assist them in the office with customers.  Ex. A-1, ¶14.  In Ayala's case, he had his ISR, his daughter Charisma, cover his AOD days and he would be out of the office, presumably meeting with customers and prospective customers.  Ex. C, ¶8.

Ayala regularly left the office for customer or potential customer appointments during the day.  *Id.*  For example, Ayala was frequently out of the office conducting "member reviews." *See* Exhibit B, Declaration of Shane Jenson, ¶¶6-9; Exhibit B-1, Member Review Chart, attached as Exhibit B-1, p. 1.  Member reviews are an important part of how agents generate business. Ex. C, ¶6.  The purpose of a member review is to provide an agent the opportunity to review a customer's insurance needs and ensure the customer is adequately covered.  *Id.*  While member reviews can be conducted in the office, Hartgrove opines that the most effective member reviews are done in the customer's home or place of business.  *Id.*  Ayala apparently subscribed to

---

[8] The commission amounts set forth herein represent the sum of (i) commissions paid by the Texas Farm Bureau Defendants and (ii) commissions paid by Southern Farm Bureau Life Insurance.  See Declaration of Sloan Brown, Exhibit A-1, ¶10; Declaration of Rena Warren, Exhibit A-2, ¶7.

Hartgrove's belief because Defendants' records reflect that, based on data entered by Ayala himself, from November 2014 through July 2016, Ayala conducted 111 member review meetings *outside* of the office, either at a customer's home or place of business.[9]  *Id.*; Ex. B-1 at 1.  Ayala, in a deposition in another case with some of the Defendants, admitted that the purpose of the member review is to "sell insurance."  *See* Exhibit D-3 at 120:14-16, Ayala's deposition testimony from *Texas Farm Bureau, et al. v. Richard Ayala, Erin Hartgrove and Charisma Ayala*, in McLennan County District Court, Cause No. 2016-3719-4.  When asked what he would do during a review, Ayala testified that "[w]e would make an appointment and go over all your coverages, and use that as a platform to sell some life insurance."  *Id.* at 120:17-22.  In addition, as part of the insurance sales process, agents have to physically inspect and photograph every property that is to be insured. Ex. C, ¶7; *see also* Ex. A-1, ¶12.  When agents are at an insured's home or place of business taking pictures of the property, they use this as an opportunity to visit with the customer, ensure that they have no other insurance needs, and further cement the customer relationship. *Id.*

Ayala's work email correspondence further reflects Ayala's practice of setting appointments with customers outside the office to discuss their insurance needs, to take photographs of their property, and to obtain signatures on applications, all part of the sales process.  *See* Exhibit D-1, Ayala email correspondence.  Perhaps the best evidence of how much time Ayala spent outside the office selling insurance is that he reported on his 2014 and 2015

---

[9]Agents in Harris County are responsible for entering their own member review data into a central database and identifying whether the review is conducted in the office, at the customer's office, or the customer's home. Ex. C, ¶6.

federal income tax returns that he drove over 30,000 miles for business purposes alone each year. *See* Exhibit D-2, Tax Return Excerpts.[10]

Simply put, the above evidence establishes as a matter of law that Ayala customarily and regularly engaged in sales away from the office. Driving over 30,000 miles a year for business purposes, regularly leaving the office, and admittedly conducting sales appointments outside the office 111 times over 20 months—not to mention significant commission earnings—is conclusive and convincing evidence that Ayala is an outside salesman. Summary judgment is appropriate.

**2. Danny Cathey (Appendix - Exhibit E)**

Danny Cathey sold insurance for Defendants from March 2008 to March 2018 in Randall County. ECF 68-5, ¶2. Cathey operated out of the Canyon, Texas office of the Randall County Farm Bureau until he moved to its Amarillo, Texas office in late 2013. S*ee* Exhibit E-1, Declaration of Bryan Sparks, ¶1. Cathey earned more than $110,000 in commissions each year in 2015, 2016 and 2017. Ex. A-1, ¶10; Ex. A-2, ¶7. Cathey opted into this lawsuit on June 15, 2008. ECF 62.

While in Amarillo, Cathey had an ISR, Valerie Kaup, who worked closely with Cathey— assisting him in scheduling appointments with customers, answering customer inquiries, and completing necessary customer paperwork. *See* Exhibit E-1, Declaration of Valerie Kaup, ¶1. Cathey would always let Kaup know when he was going to be out of the office. *Id.* at ¶2. According to Kaup, Cathey did not have any set office hours or schedule, and he did not always come into the office. *Id.* He was very involved with his children and worked his business

---

[10] Defendants have access to tax returns for a few of the Plaintiffs because these Plaintiffs used their @txfb-ins.com email addresses to communicate with their tax preparers. Pursuant to policy agreed to by agents who contract with Texas Farm Bureau Defendants, the agents have no expectation of privacy in their @txfb-ins.com emails. Ex. A-1, ¶15.

appointments and hours around their schedule.  *Id.*  Bryan Sparks, the Agency Manager for Randall County, confirms that Cathey did not have a set schedule and would work his schedule around his children's activities.  Ex. E-1 (Sparks), ¶1-2.  For example, two of Cathey's children played club sports, so he would travel with them. *Id.* at ¶2.  Further, Cathey was a painter for hire, and it was not uncommon for Cathey to share with Sparks that he was going to go paint during weekdays, and be gone for a few days or as long as a week. *Id.* Even when Cathey was "Agent of the Day" for the Amarillo office—meaning he volunteered to be at the office all day to handle walk-in business and customer calls—it was not uncommon for him to not even come into the office. Ex. E-1 (Kaup), ¶2.

Cathey was often out of the office meeting with customers and working to generate business.  *Id.* at ¶3.  Because Cathey had many customers who lived far away from the Amarillo office, he would be out of the office at least once a week visiting customers located throughout the Panhandle and east of Amarillo.  *Id.*  He would also set aside a few days every quarter to drive even farther to meet clients who were located in places like Dallas or San Antonio.  *Id.* Cathey was also out of the office at least once every week to take pictures of customers' properties, and sometimes meet with those customers as well.  *Id.*  Indeed, Cathey's work email correspondence reflects that Cathey was constantly in and out of the office on customer appointments—meeting at customers' homes and offices and taking pictures of customers' properties. *See* Ex. E-2, Cathey's email correspondence.  For example, in a February 2015 email addressing scheduling of his appointments, Cathey stated "I need three nights a week of [customer] appointments. Best days are Monday, Tuesday, and Thursday," and "I prefer to have the appointments after 5:00 and *meeting at [the customers'] home is always a priority*." Ex. E-2 at 1.  In addition, Defendants' records reflect that from June 2015 through November 2017,

Cathey conducted 88 member review meetings with existing customers to discuss their current and future insurance needs *outside* of the office. Ex. B-1 at 1. Cathey would also assist with local parades in the area at least twice a year and used those parades as an opportunity to promote his business. Ex. E-1 (Kaup), ¶3; *see also* Ex. E-2 at 23-26.

The above evidence paints a picture of a successful agent who was customarily and regularly engaged outside of the office in his primary duty of sales. Summary judgment is appropriate.

### 3. Terry Gardiner (Appendix – Exhibit F)

Terry Gardiner sold insurance for Defendants from December 2001 to April 2017 in Callahan/Shackelford County. ECF 68-16, ¶2. Gardiner received more than $80,000 in commissions in 2015, and more than $77,000 in commissions in 2016. Ex. A-1, ¶10; Ex. A-2, ¶7. Gardiner opted into this lawsuit on December 7, 2017. ECF 14.

Gardiner was already an independent insurance agent before he approached Karen Johnston, Agency Manager for Callahan/Shackelford County, about selling insurance for Defendants in 2001. *See* Exhibit F-1, Declaration of Karen Johnston, ¶1. Gardiner originally sold insurance for Defendants out of the Albany, Texas office in but transferred to the Baird, Texas office when the Albany office closed eight or nine years ago. *Id.* at ¶1-2. The Baird office is open from 8:00 a.m. to 4:30 p.m. each day. *Id.* at ¶2. According to Johnston, Gardiner never worked a set schedule and was free to come and go from the Baird office as he pleased. *Id.*

Gardiner's former secretary, Krissi Fortune, confirms that Gardiner "would come into the office whenever he wanted" and sometimes "would only be in the office for a couple of hours during the whole day." *See* Exhibit F-1, Declaration of Krissi Fortune, ¶2. The only exception to Gardiner's varied schedule was "Agent Day," when Gardiner or another agent would stay at the Baird office all day to handle walk-in business. *See* Ex. F-1 (Johnston), ¶2. But even on Agent

Day, if Gardiner or another agent had an appointment outside of the office, Johnston would be flexible so they could make that appointment. *Id.*

According to Johnston, who worked closely with Gardiner for many years, Gardiner spent more time out of the office than in the office. *Id.* at ¶3; *see also* Ex. F-1 (Fortune), ¶3 (Terry "spent a lot of time out of the office" and would leave during the day several times a week to meet with customers). For example, Gardiner made it a point to go to the cattle auction in Abilene once every three weeks or so to solicit business by handing out business cards to cattle ranchers and farmers. *See* Ex. F-1 (Johnston), ¶3. He would also visit customers' homes and take them out to lunch. *Id.* Gardiner had quite a bit of business in Albany, which is approximately 23 miles from Baird, and often drove to Albany to visit with his customers. *Id.* He also sold polices in Moran, Texas, which is about 20 miles from Baird. *Id.* Thus, Johnston estimates—based on her experience working with Gardiner—that roughly fifty percent of his sales activity was outside the office. *Id.*

Further, Gardiner performed the vast majority of his member review meetings to discuss his existing customers' future insurance needs out of the office. *Id.* at ¶5. Based on Defendants' records, entered by Gardiner himself and Johnston, from December 2014 through March 2017 Gardiner conducted 296 member review meetings with clients outside of the office—compared to only 56 in office during the same time period. *Id.*; *see also* Ex. B-1 at 2.[11]

The evidence submitted by Defendants establishes as a matter of law that Cathey qualifies for the outside sales exemption under the FLSA.

---

[11]Johnston entered approximately 20% of Gardiner's member review data into Defendants' systems. Gardiner entered the remaining 80% of the data. When Johnston was entering member review data regarding the location of the review, she would enter the location based on the location Gardiner wrote in the member review paperwork he provided to her. Ex. F-1 (Johnston), ¶5.

### 4.  Joshua Harris (Appendix – Exhibit G)

Joshua Harris sold insurance for the Defendants from December 2013 to August 2017 out of the Gun Barrel City, Texas office of the Henderson County Farm Bureau.  ECF 68-7 ¶2. Harris made nearly $85,000 in commissions in 2015, more than $90,000 in commission in 2016, and $77,000 in 2017, even though he only sold insurance for Defendants for eight months.  Ex. A-1, ¶10; Ex. A-2, ¶7.  Harris opted into this lawsuit on April 19, 2018.  ECF 57.

Lisa Russell, a secretary in the Gun Barrel City office, worked closely with Harris for approximately two years before he left in August 2017.  *See* Exhibit G-1, Declaration of Lisa Russell, ¶1.  For most of that time, Harris was the only agent in the Gun Barrel City office, and he would often tell Russell where he was going and what he was doing.  *Id.* at ¶2.

According to Russell, Harris did a significant amount of work outside of the office. *Id.* For example, Harris had a lot of elderly clients, so it was better for him to travel to meet with them than for them to come into the office.  *Id.*  Harris would schedule morning appointments at his customers' homes 3-4 times per week, and afternoon appointments at his customers' homes once or twice a week.  *Id.*  When he was out of the office, Harris would review policies with and write policies for customers, take pictures of customers' properties, get paperwork signed by customers, and just generally visit with his customers.  *Id.*  While Harris was out visiting customers, he could be out of the office anywhere from 2 to 3 hours.  *Id.*  He used to joke with Russell that some of his customers would try to fill him up with coffee and would not let him leave.  *Id.*

Defendants' member review records reflect that Harris conducted 265 member review meetings outside of the office from April 2015 through April 2017—averaging over 2 out-of-the-office member review meetings per week.  *See* Ex. B-1 at 2.  Member reviews are an important

part of customer relationship building and generating new business for agents.  Ex. G-1, ¶2; *see also* Ex. C, ¶6.

Harris also spent time out of the office networking and soliciting new business.  At least twice a month, he would go out and attend events to solicit new business.  Ex. G-1, ¶3.  For example, he would attend and hand out promotional items at livestock shows, rodeos, and local school events.  *Id.*  Sometimes, he would attend gatherings at his customers' places of business. *Id.*  As evidence of just how much Harris was on the road either meeting with customers or attending events to solicit new customers, Harris reported on his 2016 federal income tax return a $27,807 deduction for vehicle expenses based on 51,495 *business* miles. Exhibit G-2, Tax Return.

As a matter of law, the evidence outlined above establishes that Harris was customarily and regularly engaged in sales activity outside of the office.  Even assuming arguendo he was misclassified as an independent contractor, he is not entitled to overtime.

### 5. Erin Hartgrove (Appendix – Exhibit H)

Erin Hartgrove sold insurance for the Defendants from July 2006 to July 2016 out of the Memorial office in Harris County. *See* ECF 68-12, ¶2; *see also* Ex. C, ¶1.[12]  Hartgrove was a successful agent and earned significant income.  Hartgrove earned more than $230,000 in commissions in 2015 and more than $150,000 in commissions in 2016, even though he worked for only seven months.  Ex. A-1, ¶10; Ex. A-2, ¶7.  Hartgrove opted into this lawsuit on November 22, 2017.  ECF 13.

According to Steve Hartgrove, who provided services to Defendants as Agency Manager for Harris County, Hartgrove did not have a set schedule and regularly left the office during the day for customer or potential customer appointments.  Ex. C, ¶1-5.  Hartgrove's work email

---

[12] Erin Hartgrove is Steve Hartgrove's nephew.  Ex. C, ¶2.

correspondence reflects that Hartgrove was regularly out of the office on appointments with customers or prospective customers, at restaurants, coffee shops, and in their homes, discussing their insurance needs with them, providing quotes on insurance, taking photographs of customer's property to be insured, or obtaining signatures on applications.  Ex. H-1.  All of these activities are outside sales activities.

Like Ayala, Hartgrove also apparently bought in to Steve Hartgrove's philosophy that the most effective member reviews are conducted outside of the office.  Ex. C, ¶6.  Defendants' records, which consist of data entered by Erin Hargrove himself, reflect that Hartgrove conducted over 140 member review meetings with customers outside of the office from November 2014 through June 2016—as opposed to only 6 in the office during the same time period.  *See* Ex. B-1 at 2.  Hartgrove's report to his tax advisor of his business mileage in 2014 is consistent with the other evidence of Hartgrove's extensive sales activity outside the office.  In a March 3, 2015 email to his tax adviser, Hartgrove, in response to a question about his total mileage driven in 2014 and what percentage of that mileage was for business, stated "I am using 90 miles a day, 6 days a week for business.  Personal, maybe 15 to 20 miles a day."  Exhibit H-1 at 11.

All of the above evidence establishes that Hartgrove spent the vast majority of his time engaged in outside sales activity outside the office.  Summary judgment is warranted.

**6. Joe "Jay" Hawley (Appendix – Exhibit I)**

Joe "Jay" Hawley sold insurance for Defendants from November 2011 to June 2016. *See* ECF 68-4, ¶2.  Hawley earned more than $91,000 in commissions in 2015 and more than $50,000 in commissions for just half a year of work in 2016.  Ex. A-1, ¶10; Ex. A-2, ¶7.  Hawley is a named Plaintiff.  ECF 1.

Hawley worked out of the Stuebner Road office of the Harris County Farm Bureau. Ex. C, ¶1.  While an agent, Hawley regularly left the office to visit with customers during the work day and was often out of the office the entire day on Fridays. *Id.* at ¶5. From November 2014 through May 2016, based on data Hawley entered into Defendants' systems, Hawley conducted 80 member review meetings outside of the office.  *See* Ex. B-1 at 2.  In addition, Hawley's work email correspondence reveals that he was constantly out of the office for customer appointments—meeting customers at their homes to sign policies, taking pictures and conducting inspections of customers' properties, and taking customers to lunch, dinner or even out for coffee at Starbucks. *See* Exhibit I-1, Hawley email correspondence.  In September 2015, Hawley emailed a potential customer stating: "I will go anywhere you need me to. Maybe not El Paso, but around here and surrounding areas! *I'm on the road all the time for appointments*. You tell me where."  Exhibit I-1 at 6. (emphasis added).  As another example, in December 2015, when a potential customer asked Hawley if Defendants' office was open for an in-person meeting, Hawley replied: "We are open but *I have appointments outside of the office*." Exhibit I-1 at 14 (emphasis added).

This Court need look no further than Hawley's own admissions in his emails that he was customarily and regularly engaged in outside sales activity to conclude that summary judgment is appropriate.

**7.  Tanya Noriega (Appendix – Exhibit J)**

Tanya Noriega sold insurance for the Defendants from July 2008 to February 2018 out of the Rosenberg office of the Fort Bend County Farm Bureau.  ECF 68-26 ¶2; *see also* Exhibit J-1, Declaration of Christy Prihoda, ¶1.  Noriega was a successful agent, earning more than $180,000 in commissions in 2015, more than $170,000 in 2016 and more than $160,000 in 2017.  Ex. A-1, ¶10; Ex. A-2, ¶7.  Noriega opted into this lawsuit on May 25, 2018.  ECF 61.

Christy Prihoda, a county secretary and Insurance Service Representative in Fort Bend County, worked directly with Noriega in Defendants' Rosenberg office.  Exhibit J-1 (Prihoda), ¶1.  The Rosenberg office is open from 8:00 a.m. to 5:00 p.m. every weekday; Prihoda was usually one of the first people to arrive in the office and would leave at 5:00 p.m. *Id.* at ¶2. Noriega did not have a fixed schedule but would typically arrive between 9:00 a.m. and 10:00 a.m., often leave for lunch, and often leave before the office closed.  *Id.*; *see also* Exhibit J-1, Declaration of Mike Powell, ¶2 ("Tanya bounced around a bit on her hours").

Noriega was out of the office a lot meeting with customers.  Ex. J-1 (Prihoda) ¶4; Ex. J-1 (Powell), ¶2.  On average, Prihoda estimates that Noriega would leave at least daily for an appointment.  *Id.* at ¶4.  Noriega would often tell Prihoda when she was leaving to meet with a customer.  *Id.*  Sometimes, she would tell Prihoda the customer's name, and other times she would just say she had a "life appointment" (an appointment to discuss life insurance with a customer or potential customer).  *Id.*  According to Prihoda, during the time she worked with her, Noriega also conducted member reviews about 3 times a week, both in and out of the office.  *Id.* Defendants' member review data reflects that in 2016 and 2017, about half of Noriega's 199 member reviews were conducted outside of the office.  Ex. B-1 at 4.[13]  Noriega would also leave to take pictures of houses about 3-6 times per month.  Ex. J-1 (Prihoda), ¶4.  Likewise, Noriega's email correspondence from 2015 through 2017 reflects that she spent a significant amount of her time out of the office on client appointments.  Ex. J-2, Noriega email correspondence, at 9 ("I have to leave for appointments, I probably won't be back in the office until the a.m."), 18 ("I was out of the office on appointments all day yesterday."), 19 ("I have appointments out of the office

---

[13]Defendants' member review data for 2015 reflects little to no member review activity, indicating none may have been recorded for that time period.  Defendants are not relying on 2015 member review data for Noriega in support of this motion.

most of the day again today."), 28 ("And I had appointments outside afternoon yesterday afternoon and this morning."), 34 ("I work out of the office as well. I had appointments all afternoon and this morning."), 41 ("I've had a lot of appointments out of the office this week.").

> Mike Powell, the Agency Manager in Fort Bend County describes Noriega as follows:
>
>> In my opinion, good agents are out and about, in people's houses, at car dealerships, at real estate offices and drumming up business on the street.  Tanya was that kind of agent.  Tanya was always with somebody or going to see somebody and would bring something back to show for it, like a completed application.

Ex. J-1 (Powell), ¶2.

In short, Noriega was out of the office regularly and customarily working with her existing customers and attempting to generate business, all exempt outside sales activity.  She was well rewarded for that activity.  Summary judgment is appropriate.

### 8.  David Perez (Appendix – Exhibit K)

David Perez sold insurance for the Defendants from November 2004 to January 2017 out of the Robstown office of the Nueces County Farm Bureau.  ECF 68-21 ¶2; *see also* Exhibit K-1, Declaration of Brenda Hernandez, ¶2; Ex. K-1, Declaration of David Weathersby, ¶1.  Perez made almost $135,000 in commissions in 2015 and more than $125,000 in 2016.  Ex. A-1, ¶10; Ex. A-2, ¶7.  Perez opted into this lawsuit on April 18, 2018.  ECF 57.

Brenda Hernandez was Perez's primary secretary for Perez's last several years selling insurance for Defendants.  Ex. K-1 (Hernandez), ¶1.  According to Hernandez, Perez did not have a regular schedule.  *Id.* ¶2.  He typically arrived at the office between 9:00 a.m. and 10:00 a.m., took an hour or more for lunch, and left for the day at 4:30 or 4:45 p.m., sometimes even earlier.  *Id.*  Another secretary in the Robstown office, Sandra Saenz, observed the same type of schedule: arriving by 10:00 a.m., taking up to an hour and a half for lunch, and leaving by 4:00

or 4:30 p.m.  Ex. K-1, Declaration of Sandra Saenz, ¶2.  Hernandez estimates that Perez spent no more than 25 to 30 hours a week in the office.  Ex. K-1 (Hernandez), ¶4.

Hernandez, Saenz, and David Weathersby, Agency Manager in Nueces County, all confirm that Perez was frequently out of the office on customer appointments.  Many of Perez's customers were his friends, so he would frequently "hang out" with them during business hours.  Ex. K-1 (Hernandez) ¶3; Ex. K-1 (Saenz), ¶2; Ex. K-1, (Weathersby), ¶2.  Weathersby did not see this as a bad thing "because part of generating new business is further establishing relationships with customers, including friends."  Ex. K-1 (Weathersby), ¶2.  Perez also went out of the office every other day for client appointments—taking pictures of customers' properties, picking up payments from customers, having lunch with customers or performing member review meetings. Ex. K-1 (Hernandez) ¶3; Ex. K-1 (Saenz) ¶2.  When he did these things, he would be gone for several hours.  Ex. K-1 (Hernandez), ¶3.  The member review data reflects that from April 2015 through November 2017 Perez conducted 147 member review meetings with customers outside of the office. Ex. B-1 at 4.  Likewise, a review of Perez's 2015-2017 email correspondence demonstrates that he regularly met with customers outside of the office, usually at customers' homes, to review insurance policies or take photographs of their properties.  *See* Exhibit K-2, Perez' emails from 2015-2017 relating to out of the office appointments.

Perez also marketed his business outside of the office.  He would hand out koozies, pens, and pencils with the Texas Farm Bureau Insurance logo.  Ex. K-1 (Weathersby), ¶4.  He was active in the Robstown Kiwanis Club, which had meetings once a week.  *Id.*  He also worked with a non-profit group that provided scholarships for Hispanic children, which was another way to build relationships and possible referral sources.  *Id.*  Every year he would also man a booth at the biggest junior livestock show in Texas to promote himself.  *Id.*

According to Weathersby, Perez was generally a good agent, but toward the end of his time selling insurance for Defendants he was not in the office as much, and Weathersby began receiving complaints that he was not returning customers' phone calls. *Id.*, ¶5. Hernandez also observed that his tendency to not show up for work at all increased toward the end of his time as an agent. Ex. K-1 (Hernandez), ¶2.

Perez's out-of-the-office activities, including his networking with friends and clients, qualify him for the outside-sales exemption as a matter of law.

### 9. Debra Sickels (Appendix – Exhibit L)

From June 1996 to June 2016, Debra Sickels sold insurance for the Defendants in the Greenville office of the Hunt County Farm Bureau. ECF 68-23 ¶2; *see also* Exhibit L-1, Declaration of Ashley Rodriguez, ¶1. Sickels made just under $200,000 in commissions in 2015 and over $120,000 in commissions in 2016, even though she worked just half the year. Ex. A-1, ¶10; Ex. A-2, ¶7. Sickels opted into this lawsuit on June 19, 2018. ECF 63.

Ashley Rodriguez, a County Secretary and Insurance Service Representative, worked in the Greenville office with Sickels for ten years. Ex. L-1, ¶1. Rodriguez performed administrative work for Sickels and was paid a monthly bonus to help Sickels with her clients. *Id.* Rodriguez was familiar with Sickels' schedule and activities because she helped her administratively, but also because Sickels shared her "little black book" of appointments with Rodriguez, and Rodriguez's desk was directly outside of Sickel's office, so she could see Sickels as she came and went from the office. *Id.* at ¶2.

According to Rodriguez, Sickels would typically leave the office for a customer-related issue 2 or 3 times each day—sometimes more. *Id.* at ¶3. When Sickels left the office, she was usually gone anywhere from 30 minutes to several hours. *Id.* Generally, she was taking pictures of customers' properties, gathering information for quotes, giving quotes, drumming up new

business, securing new business, getting signatures on policies, picking up paperwork from customers, collecting money and meeting with new clients. *Id.* Sickels' member review data reflects that, from June 2015 through May 2016, Sickels conducted over 64 member review meetings with her customers outside of the office. *See* Ex. B-1 at 4.

Sickels also regularly participated in networking and marketing activities outside of the office to solidify her relationship with current customers and solicit new business. To solicit new clients, Sickels would attend Lion's Club meetings, hand out cards and marketing items, participate in giveaways, and assist with the Future Farmers of America.   Ex. L-1 (Rodriguez), ¶4.  Sickels would even attend livestock shows for the children of her clients and support them by helping to raise money.  *Id.*  Sickels liked to do these out-of-office activities in blocks of time, so sometimes she would be out of the office all day.  *Id.*  Rodriguez estimates Sickels spent about 15-20 hours per week out of the office working with clients or trying to secure new clients.  *Id.* at ¶5.

Sickels' email correspondence from 2015 and 2016 confirms that she was regularly out of the office on customer appointments during the day and in the evenings. *See* Exhibit L-2, Sickels' email correspondence.

As a matter of law, the activities described above place Sickels squarely within the parameters of the outside-sales exemption.

**10. Jennifer Thomason (Appendix-Exhibit M)**

Jennifer Thomason sold insurance for the Defendants from January 2011 through December 2016 in McLennan County and Parker County, Texas. *See* ECF 68-20, ¶2.  Thomason earned just under $100,000 in commissions in 2015 and more than $80,000 in 2016.  Ex. A-1, ¶10; Ex. A-2, ¶7.  Thomason opted into this lawsuit on February 9, 2018.  ECF 47.

Jessica Page worked as Thomason's secretary when Thomason worked in the Highway 6 Office of the McLennan County Farm Bureau from March 2014 through approximately May 2016, when Thomason moved to the Parker County Farm Bureau office. *See* Exhibit M-1, Declaration of Jessica Page, ¶1.  As the secretary primarily assigned to Thomason for over two years, Page interacted closely with Thomason on a daily basis. *Id.* at ¶2.  Page regularly handled Thomason's customer calls and provided general administrative support. *Id.* at ¶1.  The Highway 6 Office was open every weekday from 8:00 a.m. to 5:00 p.m., but Thomason usually came into the office only 4 days a week. *Id.* at ¶2.  On the days she did come in, Thomason arrived between 9:00 a.m. and 10:00 a.m., took an hour or two for lunch, and sometimes left early. *Id.* Thomason regularly worked outside of the office soliciting customers and attending customer appointments. *Id.* at ¶2, 4.  For example, about once a month, she set up shop at the local Dodge dealership, Allen Samuel Dodge Chrysler Jeep Ram, to solicit people who bought new cars to assist them with their insurance needs because she knew some of the finance managers and sales people at the dealership. *Id.* at ¶4.  Page describes Thomason as a "great salesperson" who often asked people outside of the office—even at gas pumps—about their insurance. *Id.*  Based on Page's observations of Thomason for over a two-year period, Thomason was out of the office approximately 50% of the time, and sometimes closer to 60% of the time. *Id.* at ¶2.

Like Page, the two Agency Managers with whom Thomason worked, Jimmy Green (McLennan County) and Sonny Black (Parker County) describe Thomason as a good salesperson.  Exhibit M-1, Declaration of Jimmy Green, ¶3; Exhibit M-1, Declaration of Sonny Black, ¶4. Both Agency Managers also confirm that Thomason was not regularly in the office and was free to set her own schedule. *See* Ex. M-1 (Green) ¶2-3; Ex. M-1 (Black), ¶2-3. According to Green, Thomason spent most of her time working outside of the office soliciting

customers and conducting member review meetings with existing or potential customers to discuss their insurance needs.  Ex. M-1 (Green), ¶2-3.  Black likewise states that Thomason was often out of the office engaged in networking and marketing efforts, including things like setting up booths at local events.  Ex. M-1 (Black), ¶3.

Green observed that Thomason conducted most of her numerous member reviews outside of the office while she was at the Highway 6 Office.  Ex. M-1 (Green), ¶2-3.[14]  The member review data for Thomason's time in Parker County, which she entered into the system herself, indicates that she conducted 36 member reviews with customers outside of the office from May 2016 through December 2016.  Ex. M-1 (Black) ¶5; Ex. B-1 at 5.  Thomason's emails confirm that she spent a great deal of her time soliciting existing and prospective customers outside of the office at lunch meetings, customers' homes and offices, networking events and trade shows, to name only a few.  *See* Exhibit M-2, Thomason email correspondence.

Thomason was a good salesperson who had the ability to set her own schedule and who spent a majority of her time out of the office engaging with clients and the community.  She qualifies for the outside-sales exemption as a matter of law.

**11. Austin Vass (Appendix – Exhibit N)**

Austin Vass sold insurance for the Defendants from February 2014 to May 2018 in Smith County, out of the Tyler office of the Smith County Farm Bureau. ECF 68-24 ¶2; *see also* Exhibit N-1, Declaration of Amanda Hale, ¶1.  Vass earned commissions totaling just less than $70,000 in 2015, more than $75,000 in 2016, and more than $90,000 in 2017.  Ex. A-1, ¶10; Ex. A-2, ¶7.  Vass opted into this lawsuit on July 20, 2018.  ECF 65.

---

[14] However, Green, not Thomason, entered Thomason's member review data into Defendants' systems at the time and did not distinguish between locations when entering the data.  Ex. M-1 (Green), ¶2-3.  Instead, Green entered all of her reviews as in the client's home. *Id.*  When Thomason transferred to Parker County, she entered her own member review data.  Ex. M-1 (Black) ¶5.

Vass's Insurance Service Representative and personal secretary, Amanda Hale, had direct access to Vass's Outlook calendar and worked directly next to his office for almost 3 years. *See* Ex. N-1, ¶1-2. According to Hale, Vass's customers would typically call the office and she would set up their appointments with Vass. *Id.* at ¶3. Vass would meet with customers outside of the office "whenever, wherever," and during the busy season, he was out of the office *every day* for customer appointments. *Id.* at ¶3-4. Even during the slow months (like November), Vass was still out of the office from time to time meeting with customers about their life insurance policies or meeting with his referral sources. *Id.* at ¶4. The member review data reflects that, from July 2015 through December 2017 Vass conducted 121 member review meetings with customers outside of the office. Ex. B-1 at 5. Jeremy Smith, an Agency Manager who worked primarily out of the Tyler office, declares that Vass was "excellent about maintaining his relationships with customers by meeting with them and discussing their insurance needs, often outside the office. Exhibit N-1, Declaration of Jeremy Smith, ¶1-2.

Vass also left the office to prospect for new business. Smith states that Vass was the "top prospector" in the office and was the "agency leader, by far, in new customers." *Id.* at ¶2. According to Smith, Vass was out of the office at least 3 days each week prospecting new customers. *Id.* Every Wednesday he attended the weekly meeting of the BNI group, a group of local businesspersons, at the Potpourri House, which was an excellent networking opportunity and referral source for him. *Id.*; Ex. N-1, Declaration of Rosemary Dickerson, ¶2; Ex. N-1 (Hale), ¶5. Hale estimates Vass received about 25% of his book of business from referrals out of BNI. Ex. N-1 (Hale), ¶5. He also had several "centers of influence" around town, like Derek Jones at Legacy Mortgage, whom he would meet with at least once a month. Ex. N-1 (Smith), ¶2. Vass also went to the Remax office about once a month with breakfast and business cards;

he took Hale with him once so his contacts would know who she was. Ex. N-1 (Hale), ¶6. He developed friendships with his referral sources, like mortgage lenders and real estate companies, so they would send him business. Ex. N-1 (Smith), ¶2; *see also* Ex. N-1 (Dickerson), ¶2. Vass also attended the Tyler Young Professionals Network and the local Texas A&M alumni group to promote his business. Ex. N-1 (Smith), ¶2; Ex. N-1 (Hale), ¶5. Every other month, Vass and other agents in the office would take coffee and breakfast to other mortgage companies and car dealerships. Ex. N-1 (Hale), ¶6.

Before Vass would leave the office, he would often tell another secretary, Rosemary Dickerson, "I'm going to hustle some business." Ex. N-1 (Dickerson) ¶2. He would then be gone for a few hours or the rest of the day. *Id.* Dickerson estimates Vass left the office several times each week (and at least once each day) to work on generating business by either meeting with referral sources or customers. *Id.*

Vass's email correspondence confirms that he was frequently out of the office meeting with customers at their homes or other locations outside of the office (for coffee or lunch, to name a few), taking photographs of customers' properties, delivering cookies, tacos and other gifts to customers, and attending various networking events (including his weekly BNI meeting). Exhibit N-2, Vass email correspondence. For instance, in February 2017, Vass sent an email to a potential customer stating: "I don't mind coming to you guys if you don't want to get out of the house. *I do that all that all the time.*" Ex. N-2 at 31 (emphasis added).

This evidence of frequent and recurrent out-of-the-office meetings and appointments with current customers and new prospects establishes as a matter of law that Vass qualifies for the outside-sales exemption.

**V.      Conclusion and prayer.**

For all the foregoing reasons, Defendants Texas Farm Bureau Casualty Insurance Company, Texas Farm Bureau Mutual Insurance Company, Texas Farm Bureau Underwriters, Farm Bureau County Mutual Insurance Company of Texas, and Southern Farm Bureau Life Insurance Company ask the Court to grant this motion on the alternative defense that the Plaintiffs addressed herein are subject to the outside-sales exemption and:

     (1) enter a take-nothing judgment against Richard Ayala and dismiss his claims with prejudice,

     (2) enter a take-nothing judgment against Danny Cathey, and dismiss his claims with prejudice,

     (3) enter a take-nothing judgment against Terry Gardiner, and dismiss his claims with prejudice,

     (4) enter a take-nothing judgment against Joshua Harris, and dismiss his claims with prejudice,

     (5) enter a take-nothing judgment against Erin Hartgrove, and dismiss his claims with prejudice,

     (6) enter a take-nothing judgment against Joe Hawley, and dismiss his claims with prejudice,

     (7) enter a take-nothing judgment against Tanya Noriega, and dismiss her claims with prejudice,

     (8) enter a take-nothing judgment against David Perez, and dismiss his claims with prejudice,

     (9) enter a take-nothing judgment against Debra Sickels, and dismiss her claims with prejudice,

     (10) enter a take-nothing judgment against Jennifer Thomason, and dismiss her claims with prejudice, and

     (11) enter a take-nothing judgment against Austin Vass, and dismiss his claims with prejudice.[15]

---

[15] The First Amended Complaint alleges violations of 29 U.S.C. §§ 207 (failure to pay overtime) and § 211(c) (failure to keep adequate time records).  To the extent Plaintiffs attempt to assert a

Defendants further request all other relief to which they may be entitled.

Respectfully submitted,

| | |
|---|---|
| **WEISBART SPRINGER HAYES LLP**<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>512.652.5780<br>512.682.2074 fax<br><br>By:    /s/ Julie A. Springer<br>        Julie A. Springer<br>        Texas Bar No. 18966770<br>        jspringer@wshllp.com<br>        Sara E. Janes<br>        Texas Bar No. 24056551<br>        sjanes@wshllp.com<br>        Matt C. Wood<br>        Texas Bar No. 24066306<br>        mwood@wshllp.com<br><br>**ATTORNEYS FOR THE TXFB DEFENDANTS** | **CARLTON FIELDS JORDEN BURT, P.A.**<br>1025 Thomas Jefferson Street, NW<br>Suite 400 West<br>Washington, D.C.  20007-5208<br>202.965.8100<br>202.965.8104 fax<br><br>By:    /s/ Markham R. Leventhal<br>        Markham R. Leventhal<br>        mleventhal@carltonfields.com<br><br>Aaron S. Weiss<br>Irma Reboso Solares<br>100 S.E. Second Street, Suite 4200<br>Miami, Florida 33131<br>305.530.0050<br>305.530.0055 fax<br>aweiss@carltonfields.com<br>islares@carltonfields.com<br><br>Cathleen Bell Bremmer<br>4221 W. Boy Scout Boulevard, Suite 1000<br>Tampa, Florida 33607-5780<br>813.229.4326<br>813.229.4133<br>cbremmer@carltonfields.com<br><br>**ATTORNEYS FOR SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY** |

---

claim based on § 211(c), it is well established that the FLSA does not create a private cause of action for a recordkeeping violation.  *See, e.g.*, *Sandoval v. Carrco Painting Contractors*, No. MO:16-CV-00159-DC, 2017 U.S. Dist. LEXIS 128863, at *10 (W.D. Tex. May 24, 2017).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record herein by way of:

| | |
|---|---|
| ☐ | U.S. Mail, First Class |
| ☐ | Certified Mail |
| ☐ | Facsimile |
| ☐ | Federal Express |
| ☐ | Hand Delivery |
| ☐ | Email |
| ☒ | ECF (electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants) |

on this 4th day of October 2018, to wit:

John Eddie Williams
Brian A. Abramson
Sean M. McCarthy
WILLIAMS KHERKHER HART BOUNDAS LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
713.230.2200
713.643.6226 fax
jwilliams@williamskherkher.com
babramson@williamskherkher.com
smccarthy@williamskherkher.com

Daniel O. Goforth
Ryan D. King
Avi Moshenberg
GOFORTH KING MOSHENBERG
1900 Pennzoil South Tower
711 Louisiana Street
Houston, Texas 77002
713.650.0022
713.650.1669 fax
dangoforth@goforthlaw.com
ryanking@goforthlaw.com
avimoshenberg@goforthlaw.com

Kelly E. Cook
Warren A. Berlanga
WYLY & COOK PLLC
4101 Washington Avenue, 2nd Floor
Houston, Texas 77007
713.236.8330
713.863.8502 fax
kcook@wylycooklaw.com
wberlanga@wylycooklaw.com

**ATTORNEYS FOR PLAINTIFFS**

/s/ Julie A. Springer
Julie A. Springer